# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | Case No. 3:19cv55 |
| v. | |
| **GLOBAL ASSET FINANCIAL SERVICES GROUP, LLC**, a limited liability company, | **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |
| **REGIONAL ASSET MAINTENANCE, LLC**, a limited liability company, also doing business as RAM LLC, | |
| **MIDWESTERN ALLIANCE, LLC**, a limited liability company, | |
| **10D HOLDINGS, INC.**, a corporation, | |
| **TRANS AMERICA CONSUMER SOLUTIONS, LLC**, a limited liability company, | |
| **LLI BUSINESS INNOVATIONS, LLC**, a limited liability company, | |
| **TACS I, LLC**, a limited liability company, formerly known as UPG, LLC, | |
| **TACS II, LLC**, a limited liability company, formerly known as BOC Processing, LLC, formerly known as BOC, LLC, | |
| **TACS III, LLC**, a limited liability company, formerly known as NRA, LLC, | |
| **CEDAR ROSE HOLDINGS & DEVELOPMENT, INC.**, a corporation, | |

1

**ANKH ALI**, in his individual and corporate capacity,

**AZIZA ALI**, in her individual and corporate capacity,

**KENNETH MOODY**, in his individual and corporate capacity,

**DAVID CARR**, in his individual and corporate capacity,

**JEREMY SCINTA**, in his individual and corporate capacity, and

**OMAR HUSSAIN**, in his individual and corporate capacity,

        Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 814 of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692*l*, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FDCPA, 15 U.S.C. §§ 1692-1692p, in connection with Defendants' deceptive and abusive debt collection practices, including attempts to harass consumers into paying debts that they do not actually owe.

2

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), and 1692*l*.

3.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(3), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.    The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the FDCPA, 15 U.S.C. §§ 1692-1692p, which prohibits abusive, deceptive, and unfair debt collection practices and imposes duties upon debt collectors.

5.    The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the FDCPA and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.   15 U.S.C. §§ 53(b), 56(a)(2)(A), and 1692*l*(a).

## DEFENDANTS

6.    Defendant **Global Asset Financial Services Group, LLC ("GAFS") is a** Delaware limited liability company with Certificates of Authority to transact business in North Carolina and South Carolina.   Its principal place of business is 5700 Executive Center Drive, Suite 102, Charlotte, North Carolina.   GAFS has also used mailing addresses of 223 E Main

3

Street, Suite 102, Rock Hill, South Carolina and 16192 Coastal Highway, Lewes, Delaware.

GAFS transacts or has transacted business in this district and throughout the United States.

7.     Defendant **Regional Asset Maintenance, LLC ("RAM")** is a Delaware limited

liability company with its principal place of business at 631 Brawley School Road, Suite 300,

PMB 158, Mooresville, North Carolina.   RAM has also used the mailing address of 300

Delaware Avenue, Suite 210-A, Wilmington, Delaware.   RAM transacts or has transacted

business in this district and throughout the United States.

8.     Defendant **10D Holdings, Inc. ("10D Holdings")** is a Florida corporation with its

registered address and principal place of business at 11380 Prosperity Farms Rd, #221E, Palm

Beach Gardens, Florida.   10D Holdings has also used the mailing address of 305 West

Broadway New York, New York.   10D Holdings transacts or has transacted business in this

district and throughout the United States.

9.     Defendant **Trans America Consumer Solutions, LLC ("Trans America")** is a

Nevada limited liability company.   Its registered address is 11380 Prosperity Farms Rd, #221E,

Palm Beach Gardens, Florida.   The address given for its manager, David Carr, is 305 West

Broadway, New York, New York.   Trans America is 100% owned by 10D Holdings.   Trans

America transacts or has transacted business in this district and throughout the United States.

10.     Defendant **Midwestern Alliance, LLC ("Midwestern Alliance")** is a Nevada

limited liability company, formerly a New York limited liability company.   The address given

for its managing member, David Carr, is 3145 Geary Boulevard, San Francisco, California.

Midwestern Alliance has also used the mailing address of 255 Great Arrow Avenue, Suite 118,

4

Buffalo, New York. Midwestern Alliance transacts or has transacted business in this district and throughout the United States.

11. Defendant **LLI Business Innovations, LLC ("LLI Business")** is a California limited liability company with its registered address and principal place of business at 506 South Spring Street, #13308, SMB 1087, Los Angeles, California. LLI Business has also used the mailing address of 255 Great Arrow Avenue, Suite 118, Buffalo, New York. LLI Business transacts or has transacted business in this district and throughout the United States.

12. Defendant **TACS I, LLC**, formerly known as UPG, LLC, **("TACS I")** is a Nevada limited liability company. The address given for its managing member, David Carr, is 3145 Geary Boulevard, San Francisco, California. TACS I has also used the mailing address of 255 Great Arrow Avenue, Suite 118, Buffalo, New York. TACS I transacts or has transacted business in this district and throughout the United States.

13. Defendant **TACS II, LLC**, formerly known as BOC, LLC and BOC Processing, LLC, **("TACS II")** is a Nevada limited liability company. The address given for its managing member, David Carr, is 3145 Geary Boulevard, San Francisco, California. TACS II has also used the mailing address of 255 Great Arrow Avenue, Suite 118, Buffalo, New York. TACS II transacts or has transacted business in this district and throughout the United States.

14. Defendant **TACS III, LLC**, formerly known as NRA, LLC, **("TACS III")** is a Florida limited liability company with its registered address and principal place of business at 3145 Geary Boulevard, San Francisco, California. TACS III has also used mailing addresses of 11380 Prosperity Farms Rd, #221E, Palm Beach Gardens, Florida and 305 West Broadway, New

5

York, New York. TACS III is 100% owned by Trans America. TACS III transacts or has transacted business in this district and throughout the United States.

15. Defendant **Cedar Rose Holdings & Development, Inc. ("Cedar Rose")** is a Florida corporation with its registered address and principal place of business at 11380 Prosperity Farms Rd, #221E, Palm Beach Gardens, Florida. Cedar Rose transacts or has transacted business in this district and throughout the United States.

16. Defendant **Ankh Ali** is the vice-president of GAFS. He is or has been an authorized signatory to the bank accounts of GAFS. He is listed as the registrant for GAFS' domain name services and as the owner for GAFS primary bank account. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GAFS, including the acts and practices set forth in this Complaint. Defendant Ankh Ali resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

17. Defendant **Aziza Ali** is a member of GAFS. She is also listed as the registered agent on GAFS' applications for certificates of authority to transact business in North Carolina and South Carolina. She is or has been an authorized signatory to the bank accounts of GAFS. She signed on behalf of GAFS on its TransUnion subscriber agreement, and listed herself as the owner on the same agreement. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GAFS, including the acts and practices set forth in this Complaint.

6

Defendant Aziza Ali resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

18.     Defendant **Kenneth Moody** is a managing member of GAFS.   At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GAFS, including the acts and practices set forth in this Complaint.   Defendant Moody, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

19.     Defendant **David Carr** is or was a manager, incorporator, director, president, or organizer of 10D Holdings, Trans America, Midwestern Alliance, TACS I, TACS II, and TACS III.   He is an authorized signatory on the bank and merchant accounts for many of the Defendants, and is listed as an authorized user for Defendants' payroll services account.   At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.   Defendant Carr, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

20.     Defendant **Jeremy Scinta** is a managing member of LLI Business and a manager of Trans America.   He is listed as the registrant and contact person for the LLI Business' Internet websites and telecommunications services.   In addition, the telecommunications services are paid with his personal credit card.   At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.   Defendant Scinta, in

7

connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

21.     Defendant **Omar Hussain** is or was a manager, director, president, or organizer of Trans America, Midwestern Alliance, TACS I, TACS II, TACS III, and Cedar Rose.   He is or was an authorized signatory on the bank and merchant accounts for many of the Defendants.   At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.   Defendant Hussain, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

### Buffalo and Charlotte Collection Defendants Operate as Common Enterprises

22.     Defendants 10D Holdings, Trans America, LLI Business, TACS I, TACS II, TACS III, and Cedar Rose, and their principals, Carr, Scinta, and Hussain (collectively "Buffalo Collection Defendants") have collected on phantom debts, including many obtained from Defendant Midwestern Alliance and its principals Defendants Carr and Hussain (collectively, "Brokering Defendants").   The principal purpose of these businesses has been the collection of debts.   Buffalo Collection Defendants have also received ample notice that consumers did not actually owe them these debts.   Buffalo Collection Defendants use a variety of unscrupulous tactics to coerce consumers into paying the fake or unauthorized debts, such as placing harassing robocalls to consumers, making unlawful threats to harass consumers' friends and family members, and failing to provide consumers with statutorily required notices of how to dispute the debts.

8

23.     Buffalo Collection Defendants have operated as a common enterprise while engaging in the unlawful acts and practices and other violations of law alleged below.   Buffalo Collection Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations, and that have commingled funds.   Because these Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.   Defendants Carr, Scinta, and Hussain have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Buffalo Collection Defendants that constitute the common enterprise.

24.     Defendants GAFS, RAM, and their principals Defendants Ankh Ali, Aziza Ali, Moody, Carr, and Scinta (collectively "Charlotte Collection Defendants") have collected on phantom debts, including those obtained from Brokering Defendants.   The principal purpose of GAFS and RAM is the collection of debts.   Charlotte Collection Defendants have also received ample notice that consumers did not actually owe them these debts.   Charlotte Collection Defendants use a variety of unscrupulous tactics—substantially similar to the tactics used by the Buffalo Collection Defendants—to coerce consumers into paying the fake or unauthorized debts, such as placing harassing robocalls to consumers, making unlawful threats to harass consumers' friends and family members, and failing to provide consumers with statutorily required notices of how to dispute the debts.

25.     Charlotte Collection Defendants have also operated as a common enterprise while engaging in the unlawful acts and practices and other violations of law alleged below.   Charlotte Collection Defendants have conducted the business practices described below through

9

interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations, and that have commingled funds. Because these Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendants Ankh Ali, Aziza Ali, Moody, Carr, and Scinta, have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Charlotte Collection Defendants that constitute the common enterprise.

COMMERCE

26.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

DEFENDANTS' MARKETING AND DISTRIBUTION OF COUNTERFEIT AND UNAUTHORIZED DEBTS

27.     Since at least 2014, and continuing thereafter, Brokering Defendants have engaged in a scheme to profit from the distribution and collection of counterfeit and unauthorized debt. Brokering Defendants have purchased and collected on two types of purported debt that consumers did not owe: counterfeit debts fabricated from misappropriated information about consumers' identities and finances; and debts purportedly owed on bogus "autofunded" payday loans that fraudulent enterprises imposed on consumers without their permission. Brokering Defendants have distributed and profited from these "phantom debts" despite receiving ample notice that the consumers did not actually owe them.

## Creation of the Phantom Debts

28.     Consumer debts that have been charged-off by the original creditors are often sold to third parties for collection or sale to other collectors.   Typically, the creditor or seller bundles debts into what they call "debt portfolios."   The portfolios are typically spreadsheets with details about the consumers and their alleged debts.

29.     Since 2014, a person named Joel Tucker has sold debt portfolios that he either fabricated or that consisted of purported debts that consumers did not legitimately owe.   Tucker has marketed counterfeit debts as owed to a number of different entities.   Tucker has also distributed "debts" from "autofunded" loans that were foisted on consumers without their permission, which he packaged together with other purported debts under the name "Bahamas Marketing Group" or "BMG".   On December 16, 2016, Plaintiff FTC sued Tucker for selling phantom debt in a case styled *FTC v. Tucker*, No. 2:16-cv-02816 (D. Kan. Dec. 16, 2016).   On September 20, 2017, the court in that case entered default judgment against the defendants and found, among other things, that Tucker had, "marketed, distributed and sold counterfeit debt portfolios that purported to represent loans made by a variety of purported originators," in contravention of Section 5 of the FTC Act.   *FTC v. Tucker*, No. 2:16-cv-02816 (D. Kan. Sept. 20, 2017) (ECF No. 69 at *3.)

30.     Prior to 2016, Tucker had access to sensitive consumer information for millions of consumers.   This information included consumers' bank account numbers, Social Security numbers, and other sensitive personal information.   Tucker used this information to create or cause to be created fake debt portfolios by matching consumers' personal information to fabricated payday loan debts.   Tucker, either directly or through entities under his control, then

11

sold these portfolios of counterfeit debt in spreadsheet format. The portfolios list consumer names and contact information along with Social Security numbers and financial account information. For each consumer identified, the portfolios provide detailed, but fabricated, information about purported payday loans, such as alleged original loan amounts, loan dates, repayment histories, and unpaid balances.

31. In addition, Tucker, through entities he controlled, obtained and sold unauthorized payday loan debts. Tucker first sold purported payday loan leads, which included consumers' bank account information, to lenders associated with him. In many instances, these lenders then issued "loans" to consumers identified in the leads without their permission, a practice referred to as "autofunding." The lenders then attempted to withdraw money from consumers' bank accounts as "finance charges" without consumers' consent. When consumers denied the attempted debits, the lenders transferred the unauthorized loans to Tucker as "debts." In September 2014, the FTC and Consumer Financial Protection Bureau ("CFPB") filed suits against these purported lenders in two cases styled *FTC v. CWB Services, et al.*, No. 4:14-cv-00783 (W.D. Mo. Sept. 5, 2014) and *CFPB v. Moseley, et al.*, No. 4:14-cv-00789 (W.D. Mo. Sept. 8, 2014). Tucker, either directly or through entities under his control, sold these debts to debt brokers, including Brokering Defendants.

**Brokering Defendants Repeatedly Purchase and Distribute Phantom Debts for Collection**

32. Brokering Defendants have operated as debt brokers since at least 2014. Among other things, Brokering Defendants have purchased and sold debt portfolios. Brokering Defendants have also placed debt for collection with their interrelated network of debt collection entities, including both the Buffalo Collection Defendants and Charlotte Collection Defendants

12

(collectively, "Collection Defendants"). Starting no later than 2014, Brokering Defendants

began purchasing phantom debt portfolios from entities controlled by Tucker, through an

intermediary, Hirsh Mohindra. On March 21, 2016, the FTC and the State of Illinois sued

Mohindra for selling counterfeit debt portfolios. *FTC et al. v. Stark Law, LLC, et al.*, No.

1:16-cv-3463 (N.D. Ill. Mar. 21, 2016).

33. On October 27, 2017, Mohindra agreed to entry of a stipulated judgment that,

among other things, banned him from the debt collection industry and imposed a $47,220,491

judgment. *FTC v. Stark Law, LLC,* No. 1:16-cv-3463 (N.D. Ill. Oct. 27, 2017) (ECF No. 354 at

*7, *9).

34. In addition to placing the phantom debts with Collection Defendants, Brokering

Defendants have sold and distributed these debts to other brokers and collectors.

35. Brokering Defendants purchase, sell, and place these portfolios despite having

notice that consumers do not owe the purported debts. For example, in March 2014, Defendant

Carr received an email from a debt collector that had purchased debts from Defendant

Midwestern Alliance. The collector complained that consumers were consistently repudiating

the debts. In particular, the collector was concerned that the lender names were doctored, or

fake. Defendants Carr and Hussain received a later email, dated June 11, 2014, from a

Midwestern Alliance employee that stated, "this portfolio has a lot of clients who paid this off."

36. Defendant Carr received another email in July 2014 from an unhappy debt

collector that had recently purchased debts from Defendant Midwestern Alliance. The collector

complained that the alleged debtors they were contacting were complaining about receiving calls

13

from multiple companies regarding the same alleged debt. Some of the alleged debtors provided proof that they had paid off the debt to another agency.

37. That same month, Defendant Scinta raised issues internally regarding the accuracy and veracity of the information contained in the portfolios. Scinta noted the high number of consumer complaints stating that consumers did not owe the alleged debts, including consumers who could prove that the bank accounts listed for deposit were not even open at the time of the alleged deposit. Further, Scinta reported that numerous Social Security numbers, addresses, and names in the portfolios did not match. Despite this, Brokering Defendants continued to distribute and collect from the Tucker portfolios riddled with phantom debt. Brokering Defendants did not withdraw the Tucker portfolios that they had already placed, or tell purchasers of these portfolios that they contained phantom debt.

38. In numerous instances, using information in debt portfolios marketed, distributed, sold, and placed by Brokering Defendants, debt collectors have contacted these consumers, demanded payment, and successfully induced consumers to pay the purported debts. In many instances, the debts in these portfolios were counterfeit or from "autofunded" loans.

39. Consumers cannot reasonably avoid collection on these phantom portfolios. Consumers are not aware that their personal information has been misappropriated and used to create a counterfeit debt or an unauthorized loan. From the portfolios, debt collectors, including Collection Defendants, obtain consumers' private personal information and sensitive financial information, such as Social Security numbers, bank account numbers, and names of references. Debt collectors recite such information to consumers to convince them that the purported loan is legitimate or that the collectors will be able to coerce the consumers to pay, even if they do not

14

legitimately owe the loan. Using this detailed information, collectors intimidated consumers into paying the purported debts.

## DEFENDANTS' DECEPTIVE AND ABUSIVE COLLECTION PRACTICES

40. Since at least 2014, Brokering Defendants have placed debts that were counterfeit or from unauthorized loans for collection with Collection Defendants.

41. Collection Defendants' scheme to collect on phantom debt is predicated on convincing consumers that a lawsuit has been, or will soon be filed against them and will result in dire consequences unless consumers pay Collection Defendants promptly.

42. In furtherance of the scheme, Charlotte Collection Defendants often use a two-step collection process to lend credence to the misrepresentations that the consumer owes them a debt and that legal action against a consumer has begun or is imminent. Payments made by consumers are processed through merchant accounts controlled by Charlotte Collection Defendants before being deposited into Charlotte Collection Defendants' bank accounts.

43. In the first step, Charlotte Collection Defendants initiate robocalls to consumers or their friends and family members, which consist of a prerecorded message that states or implies that a lawsuit has been or will soon be filed against the consumer, often regarding a purported outstanding debt owed by the consumer. In numerous instances, the prerecorded message states that the consumer must call another number for more information. The prerecorded message states that the next steps will be to notify the proper authorities.

44. In numerous instances, in placing these initial robocalls to consumers, Charlotte Collection Defendants' collectors do not identify that the call is being placed by or on behalf of Charlotte Collection Defendants, that the call is coming from a debt collector who is attempting

to collect a debt from the consumer, or that any information obtained from the consumer will be used for that purpose.

45. The second step of Charlotte Collection Defendants' collection process generally occurs when consumers call the telephone numbers that Collection Defendants' collectors provide in the initial call and are connected with collectors whose job is to secure consumers' payments for Collection Defendants.

46. In numerous instances, Charlotte Collection Defendants' collectors who answer consumers' calls falsely represent that they are representatives of a law firm or a mediation company. In numerous instances, Charlotte Collection Defendants represent that they are calling from "County Mediations" and imply that they are affiliated with the local state courthouse.

47. Similarly, in numerous instances, Buffalo Collection Defendants falsely represent to consumers during collection calls that they are representatives of a law firm, a mediation company, or other company such as "Kingston Marketing."

48. In numerous instances on these calls, Collection Defendants' collectors inform consumers that they are delinquent on a payday loan or other debt and that legal action has been taken or will be taken shortly against the consumer. In numerous instances, Collection Defendants' collectors advise consumers that they can settle the action by making a payment over the telephone via the consumer's credit or debit card.

49. In some instances, Collection Defendants' collectors possess, or claim to possess, the consumers' private information, such as Social Security numbers, bank account numbers, or

16

names and contact information of relatives, convincing consumers that the calls are legitimate collection efforts and that consumers must pay the purportedly delinquent debts.

50.     In numerous instances, to coerce consumers into paying the purported debts, Collection Defendants' collectors threaten consumers with prosecution if they fail to pay the alleged debt immediately.   For example, Collection Defendants have told consumers that the district attorney is going to file charges against them for intent to defraud or for processing hot checks.

51.     In fact, in numerous instances when Collection Defendants threaten consumers with legal action, no legal action has been taken, Collection Defendants do not intend to take any such legal action, and Collection Defendants do not have authority to take any such legal action. Collection Defendants also cannot have consumers prosecuted for non-payment of a private debt. Further, neither Collection Defendants nor their representatives are attorneys or are working for attorneys, and Collection Defendants are not a law firm.

52.     Moreover, in numerous instances, consumers do not owe the purported debt or Collection Defendants are not authorized to collect on the debt.   In fact, in numerous instances, consumers' bank statements verify that they never received the purported loan.

53.     In numerous instances, Collection Defendants also have communicated with third parties.   In numerous such instances, Collection Defendants: (1) already possessed location information for the consumer, including the consumer's place of abode, telephone number, or place of employment; (2) disclosed the consumer's purported debt to the third party; or (3) represented to the third party that Collection Defendants will commence legal action against the putative debtor if the debt is not paid.

17

54.     In numerous instances, in subsequent communications with consumers, Collection Defendants' collectors fail to disclose that they are debt collectors.

55.     In numerous instances, Collection Defendants fail to provide consumers, within five days after the initial communication with consumers, a written notice containing (1) the amount of the debt; (2) the name of the creditor to whom the debt is owed; (3) a statement that unless the consumer disputes the debt, the debt will be assumed valid; and (4) a statement that if the consumer disputes the debt in writing, Collection Defendants will obtain verification of the debt.

56.     Many consumers pay the alleged debts that Collection Defendants purport to be collecting because they are afraid of the threatened repercussions of failing to pay, because they believe Collection Defendants are legitimate and are collecting real delinquent debt, or because they want to stop the harassment.   Generally, consumers make these payments using a credit card, debit card, or electronic transfer from their bank account.   Merchant accounts Collection Defendants use to process payments from consumers are held in the name of GAFS or TACS.

57.     Since at least 2017, Collection Defendants have collected over $4.3 million from consumers through their unlawful debt collection scheme.

## VIOLATIONS OF THE FTC ACT

58.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

59.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

18

60.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I
### Means and Instrumentalities to Mislead
(Against Brokering Defendants)

61.     In numerous instances, in connection with their marketing, distribution, sale, and placement of purported payday loan debt portfolios, Brokering Defendants have represented, directly or indirectly, expressly or by implication, that consumers listed in those portfolios owe unpaid payday loan debts, and that those who obtain the portfolios through Brokering Defendants have the right to collect debts listed in the portfolios.

62.     In truth and in fact, in numerous instances, consumers listed in those portfolios that Brokering Defendants have marketed, distributed, sold, and placed did not owe the purported debts, or collectors that obtained those portfolios did not have the right to collect those purported debts.

63.     By making the representations in Paragraph 61, Brokering Defendants placed in the hands of debt collectors the means and instrumentalities by and through which they may mislead consumers regarding their debt obligations.

64.     Therefore, Brokering Defendants' representations, as set forth in Paragraph 61 of this Complaint are false or misleading, and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

19

## COUNT II
### Unfair Distribution of Counterfeit or Unauthorized Debts for Collection
(Against Brokering Defendants)

65.     In numerous instances, Brokering Defendants have distributed, placed for collection, and sold debts that were counterfeit or from unauthorized loans.

66.     Brokering Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

67.     Therefore, Brokering Defendants' actions as described in Paragraph 65 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).

## COUNT III
### False or Unsubstantiated Representations That Consumers Owe Debts
(Against Collection Defendants)

68.     In numerous instances, in connection with the collection of alleged debts, Collection Defendants have represented, directly or indirectly, expressly or by implication, that:

(a)     The consumer is delinquent on a payday loan or other debt that Collection Defendants have the authority to collect; or

(b)     The consumer has a legal obligation to pay Collection Defendants.

69.     The representations set forth in Paragraph 68 are false or misleading or were not substantiated at the time the representations were made.

70.     Therefore, the making of the representations as set forth in Paragraph 68 of this Complaint constitutes a deceptive act or practice, in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV
## False or Misleading Representations Regarding Legal Action
(Against Collection Defendants)

71.     In numerous instances, in connection with the collection of alleged debts,

Collection Defendants have represented, directly or indirectly, expressly or by implication, that:

(a)     Collection Defendants are attorneys or affiliated with attorneys;

(b)     Collection Defendants are a law firm or affiliated with a law firm;

(c)     The consumer will be prosecuted for failing to pay Collection Defendants; and

(d)     Collection Defendants have taken, intend to take, or have authority to take formal

legal action against a consumer who fails to pay, such as filing suit.

72.     In truth and in fact, in numerous instances in which Collection Defendants have

made the representations set forth in Paragraph 71 of this Complaint:

(a)     Collection Defendants are not attorneys or affiliated with attorneys;

(b)     Collection Defendants are not a law firm or affiliated with a law firm;

(c)     The consumer will not be prosecuted for failing to pay Collection Defendants; and

(d)     Collection Defendants have not taken, do not intend to take, or do not have

authority to take formal legal action against a consumer who fails to pay, such as filing suit.

73.     Therefore, Collection Defendants' representations as set forth in Paragraph 71 of

this Complaint are false or misleading and constitute deceptive acts and practices in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE FDCPA

74.     In 1977, Congress passed the FDCPA, 15 U.S.C. §§ 1692-1692p, which became

effective on March 20, 1978, and has been in force since that date.   Under Section 814 of the

21

FDCPA, 15 U.S.C. § 1692*l*, a violation of the FDCPA is deemed an unfair or deceptive act or practice in violation of the FTC Act. Further, the FTC is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the FDCPA.

75. Collection Defendants are "debt collectors" as defined by Section 803(6) of the FDCPA, 15 U.S.C. § 1692a(6).

76. A "consumer," as defined in Section 803(3) of the FDCPA, 15 U.S.C. § 1692a(3), "means any natural person obligated or allegedly obligated to pay any debt."

77. A "debt," as defined in Section 803(5) of the FDCPA, 15 U.S.C. § 1692a(5), "means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

78. The term "location information," as defined in Section 803(7) of the FDCPA, 15 U.S.C. § 1692a(7), means "a consumer's place of abode and his telephone number at such place, or his place of employment."

**COUNT V**
**Unlawful Third-Party Communications**
(Against Collection Defendants)

79. In numerous instances, in connection with the collection of debts, Collection Defendants have communicated with persons other than the consumer, the consumer's attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, the attorney of the debt collector, the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator for purposes other than acquiring location

22

information about a consumer, without having obtained directly the prior consent of the consumer or the express permission of a court of competent jurisdiction, and when not reasonably necessary to effectuate a post-judgment judicial remedy, in violation of Section 805(b) of the FDCPA, 15 U.S.C. § 1692c(b).

## COUNT VI
### Calls Without Meaningful Disclosure of Identity
(Against Collection Defendants)

80.    In numerous instances, in connection with the collection of debts, Collection Defendants have engaged in conduct the natural consequence of which is to harass, oppress, or abuse the caller, including, but not limited to, by placing telephone calls without meaningful disclosure of the caller's identity, in violation of Section 806(6) of the FDCPA, 15 U.S.C. § 1692d(6).

## COUNT VII
### False or Misleading Representations
(Against Collection Defendants)

81.    In numerous instances, in connection with the collection of debts, Collection Defendants have, directly or indirectly, expressly or by implication, used false, deceptive, or misleading representations or means, in violation of Section 807 of the FDCPA, 15 U.S.C. § 1692e, including, but not limited to:

(a)    Falsely representing the character, amount, or legal status of any debt, in violation of Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A);

(b)    Falsely representing or implying that any individual representative is an attorney or that any communication is from an attorney, in violation of Section 807(3) of the FDCPA, 15 U.S.C. § 1692e(3);

23

(c)     Threatening to take action that is not lawful or the Collection Defendants do not intend to take, such as filing a lawsuit, in violation of Section 807(5) of the FDCPA, 15 U.S.C. § 1692e(5);

(d)     Using false representations or deceptive means to collect or attempt to collect a debt or to obtain information concerning a consumer, in violation of Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10);

(e)     Failing to disclose (1) in the initial oral communication with consumers that Collection Defendants are debt collectors attempting to collect a debt and that any information obtained by Collection Defendants from consumers will be used for the purpose of attempting to collect a debt and (2) in subsequent communications with consumers that Collection Defendants are debt collectors, in violation of Section 807(11) of the FDCPA, 15 U.S.C. § 1692e(11); and

(f)     Using a business, company, or organization name other than the true name of Collection Defendants' business, company, or organization, in violation of Section 807(14) of the FDCPA, 15 U.S.C. § 1692e(14).

**COUNT VIII**
**Failure to Provide a Validation Notice**
(Against Collection Defendants)

82.     In numerous instances, in connection with the collection of debts, Collection Defendants have failed to send consumers, within five days after the initial communication with consumers, a written notice containing (1) the amount of the debt; (2) the name of the creditor to whom the debt is owed; (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to

24

be valid by Collection Defendants; (4) a statement that if the consumer notifies Collection Defendants in writing within the thirty-day period that the debt, or any portion thereof, is disputed, Collection Defendants will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by Collection Defendants; and (5) a statement that, upon the consumer's written request within the thirty-day period, Collection Defendants will provide the consumer with the name and address of the original creditor, if different from the current creditor, in violation of Section 809(a) of the FDCPA, 15 U.S.C. § 1692g(a).

CONSUMER INJURY

83.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the FDCPA.   In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.   Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

THIS COURT'S POWER TO GRANT RELIEF

84.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), empower this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.   The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

25

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), and the Court's own equitable powers, requests that the Court:

A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access to business premises, and appointment of a receiver;

B.    Enter a permanent injunction to prevent future violations of the FTC Act and the FDCPA by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the FDCPA, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

26

    D.      Award Plaintiff the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.

Dated: February 4, 2019             Respectfully submitted,

                            ALDEN F. ABBOTT
                            General Counsel

                            QUINN MARTIN
                            GREGORY A. ASHE
                            Federal Trade Commission
                            600 Pennsylvania Avenue NW
                            Washington, DC 20580
                            Telephone: 202-326-2080 (Martin)
                            Telephone: 202-326-3719 (Ashe)
                            Facsimile: 202-326-3768
                            Email: qmartin@ftc.gov, gashe@ftc.gov

                            Attorneys for Plaintiff
                            FEDERAL TRADE COMMISSION

27